[Cite as *State v. Pleasant*, 2025-Ohio-115.]


IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
LAWRENCE COUNTY


State of Ohio,                                    :          Case Nos. 23CA29
                                                                        23CA30
    Plaintiff-Appellee,                   :
                                                              DECISION AND
v.                                                  :          JUDGMENT ENTRY

Kace Deleon Pleasant,                      :

    Defendant-Appellant.              :          **RELEASED 1/13/2025**

_____
APPEARANCES:

Angela Miller, Jupiter, Florida, for appellant.

Brigham M. Anderson, Lawrence County Prosecutor, and Jenna J. Waldo, Assistant Prosecuting Attorney, Ironton, Ohio, for appellee.
_____
Hess, J.

{¶1}   In consolidated cases, Kace Deleon Pleasant appeals from judgments of conviction for aggravated murder with a firearm specification, abuse of a corpse, tampering with evidence, failure to comply with an order or signal of a police officer, theft of a motor vehicle, and robbery entered by the Lawrence County Court of Common Pleas in two cases following a jury trial.  Pleasant presents six assignments of error asserting: (1) there is insufficient evidence to support the verdicts for aggravated murder, failure to comply with an order or signal of a police officer, and theft of a motor vehicle; (2) his convictions were against the manifest weight of the evidence; (3) the trial court erred in denying his motion to suppress; (4) the trial court erred in consolidating his cases and

granting a motion in limine; (5) he received ineffective assistance of counsel; and (6) prosecutorial misconduct denied him constitutional rights.  For the reasons which follow, we overrule the assignments of error and affirm the trial court's judgments.

I.  FACTS AND PROCEDURAL HISTORY

A.  Pre-Trial Proceedings

{¶2}    On November 1, 2022, Pleasant was indicted in Case No. 22 CR 374 on six counts alleged to have occurred on or about October 25 and 26, 2022, in Lawrence County:  (1) aggravated murder in violation of R.C. 2903.01(A), an unclassified felony, with a firearm specification; (2) murder in violation of R.C. 2903.02(A), an unclassified felony, with a firearm specification; (3) abuse of a corpse in violation of R.C. 2927.01(B), a fifth-degree felony; (4) tampering with evidence in violation of R.C. 2921.12(A)(1), a third-degree felony; (5) failure to comply with an order or signal of a police officer in violation of R.C. 2921.331(B) and (C)(5)(a)(ii),[1] a third-degree felony; and (6) theft of a motor vehicle in violation of R.C. 2913.02(A)(1) and (B)(5), a fourth-degree felony.  On November 23, 2022, he was evidently indicted in Case No. 22 CR 383 on two counts alleged to have occurred on or about October 26, 2022—one count of robbery in violation of R.C. 2911.02(A)(2) and one count of kidnapping in violation of R.C. 2905.01(A)(2), both second-degree felonies.  On July 14, 2023, he was indicted in Case No. 23 CR 165 on the same two counts, evidently to correct a clerical error in the second indictment regarding the county where the acts occurred, Scioto County.

{¶3}    The trial court denied Pleasant's motion to suppress evidence.  In addition, before the indictment in Case No. 23 CR 165, the State moved to consolidate Case Nos.

---

[1] The indictment tracks the language in these two provisions but refers to them as "R.C. 2921.331(B)(5)(a)(ii)."

22 CR 374 and 22 CR 383 for trial purposes, and Pleasant opposed the motion. After the indictment in Case No. 23 CR 165, the court issued an entry stating that the State orally moved to consolidate all three cases for trial purposes, Pleasant "did not object," and the motion was granted. Before trial began, the State moved the court to nolle Case No. 22 CR 383 and apply its "previous consolidation order" to Case No. 23 CR 165. Defense counsel noted an objection to consolidation, the trial court orally dismissed Case No. 23 CR 383, and the matter proceeded to a jury trial on Case Nos. 22 CR 374 and 23 CR 165.

## B. Trial

### 1. Initial Investigation

**{¶4}** An Ironton sanitation truck driver testified that on October 26, 2022, he was working the morning shift with two other sanitation workers when a man, who the driver identified as Pleasant, drove up in a black, four-door car and approached the driver. Pleasant was wearing blue surgical gloves and told the driver he "had a bag of trash he needed to throw away." Pleasant handed a bag to one of the other workers, asked about whether the trash was running in the area that day, but would not give the driver an address. Pleasant got "kinda antsy," said he needed to get gas, pointed toward Liberty Avenue, and left. The driver opened the bag and saw clothing, surgical gloves, and a cleaning bottle with a bloody fingerprint on it. He called 911 and gave the bag to law enforcement. The driver continued with his route and saw Pleasant again. He ran out of a garage at a residence wearing gloves and carrying some bags, which he threw in the truck. Pleasant then walked into the residence through the back door and returned with another bag, which he handed to one of the workers. The driver went to another location,

opened some of the bags, and saw bloody shoes, cleaning supplies, and a blue blanket soaked in blood. He called 911 and directed law enforcement to the residence, which he identified photos of at trial. Other evidence showed it was located at 1217 South 9th Street and belonged to Pleasant's grandparents ("grandfather" and "grandmother").

{¶5} Chief Dan Johnson of the Ironton Police Department testified that he met with the sanitation workers twice, collected the trash bags, and went to the house the workers identified. He had been there three weeks earlier to conduct a well-being check on grandmother, which was recorded on his body camera. On the footage, grandfather says Pleasant has stolen from him, threatened him, and has to go, and Chief Johnson talks to grandfather about eviction proceedings.

{¶6} Chief Johnson parked in an alley to watch the back of the residence and directed Officer Hammonds to watch the front. Chief Johnson called Sergeant Anthony Forrest, who was familiar with the Pleasant family. Sergeant Forrest testified that he called the house twice, but his phone's call log indicates the second call was an incoming call to his phone, not an outgoing call. Sergeant Forrest testified that during the first call, Pleasant told him grandfather was asleep and that he would give grandfather the phone when he woke up. The phone went dead. During the second call, Pleasant told him grandfather was in the bathroom and that he would give grandfather the phone when he came out. Then the phone went dead again.

{¶7} Sergeant Forrest told Chief Johnson about the conversations, and Chief Johnson saw a maroon vehicle back out of the garage and go through the alley. Chief Johnson testified that he drove to South 9th Street and saw the vehicle pull in the house's driveway. Pleasant got out and took a few steps toward the house. Pleasant got back in

the vehicle after Officer Hammonds exited his car. Pleasant started backing out.  Chief Johnson, Officer Hammonds, Captain Pauley, and Patrolman Fouch tried to "box" Pleasant in with their cruisers. He "managed to squeeze between two cruisers" and traveled down South 9th Street at a high rate of speed in the opposite direction Chief Johnson's vehicle was facing. Chief Johnson testified he did not have his lights or siren on when he "first pulled up" as he thought they were just "pulling up to talk to" Pleasant. Chief Johnson testified that he turned them on when he turned around.  But by the time he was turned around, Pleasant "had already left 9th Street" and "hit Park Avenue," and there was no way Chief Johnson could catch him. Other officers pursued Pleasant, but Chief Johnson did not know if they had lights or sirens going.

### 2.  Search of the House

{¶8}    Investigator Matthew McGraw of the Lawrence County Drug and Major Crime Task Force testified that he and Captain Pauley entered the house to perform a well-being check on grandfather. They did not find anyone in distress, but Investigator McGraw saw a pillow with a small blood stain in one bedroom and a surgical glove on the bed in another bedroom.  Deputy U.S. Marshal Alex Neville, Jr., saw that lattice around the bottom of the back deck had been pulled away from the deck screws.  He shined his flashlight under the deck and saw what appeared to be a human figure wrapped in an area rug.

{¶9}    Special Agent Cassandra Tackett of the Ohio Bureau of Criminal Investigation ("BCI") provided assistance at the scene after a search warrant was acquired. She testified that there was an "overwhelming smell of gasoline" in the backyard and two gas cans in a shed, one empty, and one with some gasoline.  She testified that

grandfather's unclothed body was in the bundle under the deck. He was wrapped in sheets (one white with blue seashells), a mattress pad, trash bags, and wet rugs which smelled like gasoline. Evidence showed his cause of death was multiple gunshot wounds of the head, his time of death could not be determined, and his skin was slipping off in multiple areas on his chest and upper extremities, which could be due to an irritant, like gasoline. Special Agent Tackett testified that grandfather was a large man and more than one person assisted in picking up and moving his body.

{¶10} Special Agent Tackett testified there were no signs of forced entry on the front or back door of the house, and the front door dead bolt was activated. The interior of the house had a strong odor of cleaning products, and there were cleaning wipes and latex gloves all over the house. The floor in the master bedroom was wet and discolored in places. There was a rectangular outline on the carpet where it looked like a rug had once been. There were wet marks on the sheets (one sheet was white with blue seashells), and the mattress was very wet. There was reddish-brown staining on the edge of the mattress and a red stain on the carpet by the bed frame. A blood visualizing agent indicated the presence of suspected blood on the mattress, bed frame, and floor.

{¶11} There was a silver Nissan Altima in the garage. There was a box of blue gloves and two utility lighters in the vehicle. There was also a blue glove and lighter on the garage floor by the driver's side door.

### 3. Forensic Evidence

{¶12} Swabbing from an exterior stain on a glove in one trash bag given to the sanitation workers contained a DNA profile consistent with grandfather. Swabbing from the unstained interior of the glove contained major DNA profiles consistent with both

grandfather and Pleasant. Swabbing from the bottom of one trash bag found around grandfather's body contained a major DNA profile consistent with Pleasant.

{¶13} The State presented evidence that bullets recovered from grandfather and a pillow in one of the trash bags given to the sanitation workers were fired by the same firearm, were consistent with being 9mm Luger bullets, and were consistent with being fired by several brands of firearms, including Taurus. Three fired 9mm Luger cartridge cases recovered from one of the trash bags given to the sanitation workers were fired by the same firearm. The cases were Speer brand, and one of the fired bullets had a feature consistent with Speer's gold dot ammunition. A forensic scientist from BCI testified that with that type of ammunition, "the outside coating of the jacket is usually copper," "[p]art of that is pressed into the nose," and there is a "jacketed hollow point." When the bullet hits something, the copper jacketing, or the "gold dot," is sometimes visible. The scientist saw that on the bullet from grandfather. The scientist would not call Speer's gold dot ammunition "rare" but also "wouldn't necessarily call it something popular."

4. Flight from Law Enforcement

{¶14} Although Chief Johnson initially testified Pleasant fled in a Camaro, he later testified, and other evidence indicates, it was a Corvette, and the vehicle belonged to grandfather. The State presented evidence that after fleeing from grandfather's house, Pleasant posted a video on Snapchat. In the footage, Pleasant says, "I lost my tire, and I'm on the run from the feds. I'm going 140 on the fucking highway," and he later says, "I'm going about 107. They popped my tire. They tried to corner me in."

{¶15} The office manager for a business by U.S. 23 in Lucasville testified that on October 26, 2022, she went to the post office around 9:26 a.m., and on the way, she saw

a burgundy car sitting in the road and thought it must have broken down. When she returned to work, she saw a man, who she identified as Pleasant.  After she parked and exited her car, he approached her.  When she turned to look at him, he hit her "upside the head," grabbed her neck, and choked her.  He knocked everything out of her hands, and her finger was cut.  He somehow got in the driver's seat and started pulling her in the vehicle, toward the passenger side. She screamed, and a coworker ran up, "started pounding" on Pleasant, and broke her loose. She called 911 and reported that a man grabbed her keys, hit her, cut her finger, and was trying to get in people's cars.

{¶16}  The coworker testified he thought Pleasant hit the office manager, saw her paperwork hit the ground, and ran to help. When he got to her car, Pleasant was in the driver's seat, had the office manager in a headlock, and was "trying to pull her up over the steering wheel and get her in the car." The coworker fought with Pleasant, and the office manager got away.  Their boss came out and grabbed one of Pleasant's arms, but he escaped, and the coworker chased him.

{¶17}  The boss testified that he heard the coworker screaming, ran to help, and saw Pleasant and the coworker in a scuffle. The boss grabbed one of Pleasant's arms, but he got away. Later, the boss got Pleasant's location from the coworker and held Pleasant at gun point until the state patrol arrived.

{¶18}  Video footage from the business does not fully depict the events there due to the positioning of the camera. However, Pleasant is initially visible on the footage.  After he goes out of frame, there is a point when the tip of a vehicle door is visible, and what appears to be Pleasant's boot is near it.  Papers fly to the ground, and a man runs toward the vehicle.  A woman comes away from the vehicle. The man appears to be involved in

a struggle with someone in the vehicle, and what appears to be a set of keys is tossed to the ground before a second man runs toward the vehicle.

### 5.  Statements to Law Enforcement

**{¶19}** Trooper Nick Lewis of the Ohio State Highway Patrol arrested Pleasant. Video footage shows that while Pleasant is in the back seat of the cruiser, Trooper Lewis notifies him of his *Miranda* rights and asks if he understands them.  Pleasant nods, and Trooper Lewis says, "Can you say yes?"  Pleasant says, "Yes."  As Trooper Lewis closes the door, Pleasant says, "Oh fuck." Once the door is closed, Pleasant says, "I'm dead." Later, Trooper Lewis asks Pleasant for his name and social security number.  Pleasant says that he does not know them, that he has asthma, and that he cannot breathe.

**{¶20}** At one point, Pleasant says, "Can you just kill me?" Trooper Lewis says, "How many people did you kill?" Pleasant says, "I didn't kill nobody.  Can you kill me please?  Please?" Pleasant says, "I don't want to live no more" and continues to ask Trooper Lewis to kill him. Later, Pleasant claims someone tried to kill him.  Trooper Lewis asks who, and Pleasant repeatedly states, "Somebody tried to kill me." Trooper Lewis gets Pleasant out of the cruiser to check his pockets, and Pleasant says he "can't walk" or feel his arms or legs. Around 22 minutes after Pleasant reported breathing problems, paramedics arrive. They test his blood sugar level, and one paramedic says that the "sugar says low."

**{¶21}** At times during the video footage from the arrest scene, Pleasant appears to be in distress, is breathing heavily, and is slumped over.  The prosecutor asked Trooper Lewis if Pleasant had "any problem with his legs" when Trooper Lewis arrested him and

transported him to the cruiser. Trooper Lewis testified, "No. No problems." The prosecutor asked if Pleasant was "passing out," and Trooper Lewis testified,

> No sir. The only time that it appeared that his body would go limp was when we opened the door. Other than that, I…we kept sight on him from outside the cruiser, make sure I could see his head, make sure he wasn't slouched over, laying in the seat or anything like that. The only time his body went limp was whenever we opened the door and made contact with him.

The prosecutor asked, "Did you feel he was in any medical danger?" Trooper Lewis said, "I did not, no." On cross-examination, Trooper Lewis testified that he thought Pleasant was faking and only called for a squad because Pleasant said he had asthma and needed an inhaler. Trooper Lewis testified that Pleasant was transported to the hospital. Pleasant's medical records indicate that while at the hospital, his glucose level was in the normal range, and he was discharged a few hours after his arrival.

{¶22} Investigator McGraw and Captain Pauley conducted a recorded interview of Pleasant at the hospital. When asked preliminary questions, Pleasant said he thought a certain date was his date of birth, that he did not have a current address, that he did not know where he had been staying, and that he did not know the highest grade he completed. He complained that his head was "pounding." Throughout the rest of the interview, Pleasant repeatedly indicates he does not know the answers to questions. For example, when asked about what transpired at grandfather's address in the past 24 hours, Pleasant indicates he only remembers being on the ground and seeing "black." When asked where grandfather is, Pleasant says, "Who?" When asked what happened between him and grandfather at the house, Pleasant says, "I don't know what you're talking about." On cross-examination, Investigator McGraw testified that he did not alert medical staff when Pleasant said that his head was "foggy" during the interview.

6. Testimony of Family and Friends

**{¶23}** Pleasant's father ("father") testified that he visited Pleasant in jail. During one visit, father asked Pleasant "why?" Pleasant said, "Dad, I didn't do it." Then Pleasant said, "Dad, he said he was going to kill you," and "Dad, he said I wouldn't be here on this earth." Pleasant was referring to grandfather. During another visit, father wanted to know if grandfather was "aware of what was getting ready to happen to him. Like, did he see this coming?" Pleasant said, "Yeah, he opened his eyes. He saw me. He was reaching for a weapon." Pleasant showed "no remorse." Father testified that he has three felony convictions and has only had a relationship with Pleasant for the past two or three years.

**{¶24}** Pleasant's mother ("mother") testified grandfather's Corvette was his "dream car," and to her knowledge, no one had permission to drive it. On January 25, 2022, mother kicked Pleasant out of her house because he took her car without permission. She packed his things and offered to bring them to him. He came to the house and started pounding on the windows and doors and screaming. After she called the police, she heard glass breaking. She testified that Pleasant "had kicked in the basement door" but later indicated it was a window. He entered the house, got in her face, "kind of shoved" her friend "a little bit," and ran all over the house before leaving.

**{¶25}** Mother testified that on a subsequent occasion, someone entered the home through the same window and stole a 9mm gun, $2,000 in cash from mother's boyfriend's underwear drawer, her boyfriend's passport, and the social security cards of her boyfriend and his mom. Mother thought Pleasant was the thief because he was "the only one that knew how to get through that window," but she admitted anyone on the side of the house could see the window, which was boarded up from the first incident. Mother also testified

that Pleasant "knew exactly where to go in our house. He had been staying with us. Obviously, he had been through our bedroom because I didn't even know how much money" was in the underwear drawer. She testified that "a criminal would go and steal one of our credit cards that were sitting on a table, I would think, or anything else in the house that was valuable." She also noted that a passport was taken and testified that "we were about to go out of the country." Mother admitted Pleasant was not arrested for the theft and that she had no physical evidence or eyewitnesses to establish he was the culprit.

**{¶26}** Mother's boyfriend testified that on February 9, 2022, someone broke into their home during a one-hour period when they were both out of the house. The thief gained entry by kicking in the boards covering the basement window Pleasant had previously broken. The boyfriend testified that the stolen Taurus was loaded with "defense bullets" or "hollow points," which had copper heads and silver casings. The State introduced a 9mm round of Speer ammunition, which the boyfriend testified came from his extra clip and was the same kind of ammunition that was in the Taurus. The boyfriend testified that a few weeks after the theft, he recovered his passport, which was found on the side of a highway. He did not recover any of the other stolen items.

**{¶27}** Pleasant's uncle ("uncle") visited his parents in September 2022. Pleasant was living with them, and grandfather said there was a lot of tension in the house because money and collectables had disappeared, grandfather had unexplained credit card charges, and he had some heated conversations with Pleasant. Grandfather talked about the legal process to get Pleasant out of the house or get a restraining order. Pleasant told uncle that grandfather was not doing enough to take care of grandmother, who went

to a nursing home about a week later. Pleasant said that if grandfather "gets in my face one more time, you know, I'm going to hurt him real bad or he's going to be lucky I don't kill him." Uncle did not "take it seriously" but thought "something would happen physically" and talked to grandfather about it. Grandfather told him Pleasant "had said it multiple times" and that grandfather would be getting "paperwork" soon.

{¶28} Pleasant's great aunt ("great aunt") called the house on October 25, 2022, around 8:15 p.m., and spoke to grandfather and Pleasant for about 20 minutes. Grandfather and Pleasant were "bantering back and forth" about who was going to pick up some dog poop. Great aunt had never seen them have a physical confrontation and testified that Pleasant helped grandmother with things like getting to the doctor.

{¶29} A family friend testified that in the weeks leading up to October 25, 2022, Pleasant said he was "going to kill" grandfather a couple times. On October 25, 2022, Pleasant "was a little more enraged" when he again told the friend he was "going to kill" grandfather. The friend did not think he was serious. The friend also testified that Pleasant usually drove grandmother's car, but the friend had seen him drive grandfather's Corvette alone.

### 7. Other Evidence

{¶30} At the time of his arrest, Pleasant had one of grandfather's credit cards which was used for two purchases on October 26, 2022. One was from a Portsmouth Super Quik where Pleasant got gas in the Corvette. The other was from the Ironton Liberty Avenue Speedway for 19.19 gallons of gas. The Nissan could hold 16.2 gallons. In addition, evidence showed records associated to Pleasant contained gangster rap lyrics from October 2022 about topics like murder.

### 8. Defense Witnesses

**{¶31}** After the State rested its case, the prosecutor told the court he believed the defense planned to call Captain Chad Gue of the Ironton Police Department to testify that one of the sanitation workers "misidentified the defendant or identified someone else in the lineup." Evidence from the suppression hearing showed Captain Gue administered a photo lineup to the sanitation workers. The driver identified Pleasant with a confidence level of 9 out of 10. One worker did not make an identification, and the other worker identified someone other than Pleasant with a confidence level 7 out of 10. The prosecutor made a motion in limine to prevent the defense from eliciting testimony from Captain Gue about this identification on the ground it would be impermissible hearsay. The court granted the motion, and the defense did not call Captain Gue as a witness.

**{¶32}** The only defense witness was a woman who was driving on U.S. 23 the morning of October 26, 2022, and saw a Corvette with a blown tire and Pleasant walking down the middle of the highway trying to get someone to stop. She gave him a ride to a gas station. He seemed stressed but was nice to her.

### 9. Verdict and Sentencing

**{¶33}** In Case No. 22 CR 374, on the State's motion, the court dismissed the murder count and instructed the jury on murder as a lesser included offense of aggravated murder. The jury found Pleasant guilty of the remaining counts and firearm specification in that case and guilty of both counts in Case No. 23 CR 165. The trial court merged the kidnapping count into the robbery count for sentencing purposes. And after the court sentenced Pleasant in both cases, he filed notices of appeal from the sentencing entries, and we consolidated his appellate cases on his motion.

## II.  ASSIGNMENTS OF ERROR

**{¶34}** Pleasant presents six assignments of error:

Assignment of Error I:  The verdicts for aggravated murder, theft of a motor vehicle, and failure to comply with a signal of an officer, which are supported by insufficient evidence, violated Appellant Pleasant's constitutional rights as guaranteed by the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

Assignment of Error II: Appellant Pleasant's convictions were against the manifest weight of the evidence.

Assignment of Error III: The trial court erred in denying Appellant Pleasant's Motion to Suppress as the evidence gathered was done without consent and the statements made were unlawfully obtained.

Assignment of Error IV:  The trial court erred in consolidating cases 23 CR 165 and 22 CR 374 and granting the State's motion in limine, depriving Appellant Pleasant of a fair trial.

Assignment of Error V:  Appellant Pleasant received ineffective assistance of counsel when his attorney: 1) did not file a motion in limine objecting to the introduction of inadmissible and prejudicial evidence and 2) failed to call the correct witnesses on misidentification.

Assignment of Error VI:  Prosecutorial misconduct during the trial denied Pleasant of his rights under Article I, §§ 5, 9, 10, and 16 of the Ohio Constitution and the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution.[2]

## III.  SUFFICIENCY OF THE EVIDENCE

**{¶35}** In the first assignment of error, Pleasant contends the verdicts for aggravated murder, failure to comply with an order or signal of a police officer, and theft of a motor vehicle are supported by insufficient evidence.  In reviewing the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential

---

[2] The assignments of error are taken from pages 9, 15, 17, 20, 23, 28 of Pleasant's  appellate brief.  Some assignments of error are stated differently elsewhere in the brief.

elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102, fn. 4 (1997), and following *Jackson v. Virginia*, 443 U.S. 307 (1979). "A sufficiency assignment of error challenges the legal adequacy of the state's prima facie case, not its rational persuasiveness." *State v. Anderson*, 2019-Ohio-395, ¶ 13 (4th Dist.). "That limited review does not intrude on the jury's role 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Musacchio v. United States*, 577 U.S. 237, 243 (2016), quoting *Jackson* at 319. We will not overturn a conviction based on insufficient evidence "'unless reasonable minds could not reach the conclusion that the trier of fact did.'" *State v. Cook*, 2019-Ohio-4745, ¶ 15 (4th Dist.), quoting *State v. Bradshaw*, 2018-Ohio-1105, ¶ 15 (4th Dist.)

### A. Aggravated Murder

**{¶36}** R.C. 2903.01(A) states: "No person shall purposely, and with prior calculation and design, cause the death of another . . . ." The trial court instructed the jury that "[a] person acts purposely when it is his specific intention to cause a certain result" and that

> "[p]rior calculation and design" means that the purpose to cause the death was reached by a definite process of reasoning in advance of the homicide, which process of reasoning must have included a mental plan involving studied consideration of the method and the means or instrument with which to cause the death. To constitute or be prior calculation, there must have been sufficient time and opportunity for the planning of an act of homicide, and the circumstances surrounding the homicide must show a scheme designed to carry out the calculated decision to cause the death. No definite period of time must elapse, and no particular amount of consideration must be given, but acting on the spur of the moment or after momentary consideration of the purpose to cause the death is not sufficient.

**{¶37}** There is no bright-line test for the presence or absence of prior calculation and design; "'each case turns on the particular facts and evidence presented at trial.'" *State v. Walker*, 2016-Ohio-8295, ¶ 19, quoting *State v. Taylor*, 78 Ohio St.3d 15, 20 (1997). However, courts traditionally consider three factors: "'(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or "an almost instantaneous eruption of events?"'" *Id.* at ¶ 20, quoting *Taylor* at 19, quoting *State v. Jenkins*, 48 Ohio App.2d 99, 102 (8th Dist. 1976).

**{¶38}** Pleasant contends there is no evidence he "planned ahead of time to kill his grandfather." Pleasant asserts that he helped his grandparents, that he had no prior physical confrontations with grandfather, that the family friend thought his threat to kill grandfather was just talk, that there is no evidence he knew grandfather discussed evicting him, and that the disagreement over the dog was "nothing over-the-top or unusual." Pleasant claims there is no evidence of thought or preparation in choosing the murder site or weapon. Pleasant asserts that he and grandfather simply lived in the same house, he was never seen with a gun, mother speculated that he stole one from her home, BCI could not identify the gun used in the shooting, and no gunshot residue, blood, or DNA was found on him. He also asserts there is no evidence the killing was drawn out and claims it appears to be the result of "an instantaneous eruption of events."

**{¶39}** Viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that Pleasant caused grandfather's death purposely and with prior calculation and design. There is evidence that Pleasant and grandfather knew each other and had a strained relationship. In the

weeks leading up to the murder, grandfather and Pleasant both indicated there was tension between them. Pleasant told uncle that if grandfather "gets in my face one more time, you know, I'm going to hurt him real bad or he's going to be lucky I don't kill him." Grandfather told Chief Johnson that Pleasant had stolen from and threatened him and that he wanted Pleasant out of the house. Pleasant also told a family friend that he was "going to kill" grandfather a couple times. The day of or day before the murder, Pleasant "was a little more enraged" when he again told the family friend that he was "going to kill" grandfather.

{¶40} A reasonable juror could also find that Pleasant considered the murder weapon and site and that the killing was not the result of an almost instantaneous eruption of events or momentary consideration. Pleasant talked about killing grandfather for weeks leading up to the murder, including the day of or before the murder. Evidence showed grandfather was in bed at the time of the murder. When Pleasant's father asked if grandfather was aware of what was going to happen to him, Pleasant said, "Yeah, he opened his eyes. He saw me. He was reaching for a weapon." This evidence suggests Pleasant brought a firearm to grandfather's bedroom for the purpose of shooting him to death there.

{¶41} For the foregoing reasons, we conclude there is sufficient evidence to support the aggravated murder verdict and overrule the first assignment of error to the extent it asserts otherwise.

B. Failure to Comply with an Order or Signal of a Police Officer

{¶42} R.C. 2921.331(B) states: "No person shall operate a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a

police officer to bring the person's motor vehicle to a stop."  A violation of this provision is a third-degree felony if the jury or judge as trier of fact finds by proof beyond a reasonable doubt that "[t]he operation of the motor vehicle by the offender caused a substantial risk of serious physical harm to persons or property."  R.C. 2921.331(C)(5)(a)(ii).

**{¶43}** Pleasant contends that he "was not given a visible or audible signal to stop." He asserts that Chief Johnson "testified that he did not activate his lights or siren until after Pleasant was gone" and that "no other officer testified that [he] was signaled to stop while he was driving."

**{¶44}** Viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that Pleasant received a visible or audible signal to stop the Corvette.  The officers gave Pleasant a visible signal to stop the Corvette when they tried to box the Corvette in with their vehicles.  Pleasant received this signal as evidenced by his evasive driving (driving between two cruisers and leaving 9th Street at a high rate of speed), and the Snapchat video in which he stated that he was "on the run from the feds" and that "[t]hey tried to corner me in." Thus, we conclude there was sufficient evidence to support the failure to comply verdict and overrule the first assignment of error to the extent that it asserts otherwise.

### C.  Theft of a Motor Vehicle

**{¶45}** R.C. 2913.02(A)(1) states:  "No person, with purpose to deprive the owner of property . . . shall knowingly obtain or exert control over . . . the property . . . [w]ithout the consent of the owner or person authorized to give consent . . . ."  R.C. 2913.02(B)(5) states:  "If the property stolen is a motor vehicle, a violation of this section is grand theft of a motor vehicle, a felony of the fourth degree."   "Deprive" means to:

(1) Withhold property of another permanently, or for a period that appropriates a substantial portion of its value or use, or with purpose to restore it only upon payment of a reward or other consideration;

(2) Dispose of property so as to make it unlikely that the owner will recover it;

(3) Accept, use, or appropriate money, property, or services, with purpose not to give proper consideration in return for the money, property, or services, and without reasonable justification or excuse for not giving proper consideration.

R.C. 2913.01(C).

**{¶46}** Pleasant suggests the State did not prove he drove the Corvette without grandfather's consent on October 26, 2022. Pleasant suggests he had consent because he had a relationship with grandfather and had driven the Corvette before. He also asserts that there is no evidence he acted with purpose to deprive grandfather of the Corvette.

**{¶47}** Viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found Pleasant, with purpose to deprive grandfather of the Corvette, knowingly obtained or exerted control over the Corvette without his consent. Evidence suggests grandfather never consented to Pleasant driving the Corvette. Although the family friend had seen Pleasant driving the Corvette, grandfather was not with him. Mother testified that the Corvette was grandfather's dream car, and to her knowledge, no one had permission to drive it. Moreover, evidence indicates that grandfather and Pleasant had a strained relationship prior to grandfather's death, in part because grandfather believed Pleasant had stolen from him. Even if grandfather previously gave Pleasant permission to use the Corvette, such permission necessarily ended once Pleasant murdered him. And given the evidence that Pleasant murdered grandfather and then took the Corvette and used it to flee from law enforcement at the

scene of the murder, one could reasonably infer that he acted with purpose to withhold

the Corvette permanently.  Thus, there was sufficient evidence to support the theft of a

motor vehicle verdict, and we overrule the remainder of the first assignment of error.

IV.  MANIFEST WEIGHT OF THE EVIDENCE

**{¶48}**  In the second assignment of error, Pleasant contends his convictions were

against the manifest weight of the evidence. In determining whether a conviction is

against the manifest weight of the evidence, an appellate court

> must review the entire record, weigh the evidence and all reasonable
> inferences, consider the credibility of witnesses, and determine whether, in
> resolving conflicts in the evidence, the trier of fact clearly lost its way and
> created such a manifest miscarriage of justice that reversal of the conviction
> is necessary. In order to satisfy this test, the state must introduce substantial
> evidence on all the elements of an offense, so that the jury can find guilt
> beyond a reasonable doubt.
>
> Although a court of appeals may determine that a judgment of a trial court
> is sustained by sufficient evidence, that court may nevertheless conclude
> that the judgment is against the weight of the evidence. However, we are
> reminded that generally, it is the role of the jury to determine the weight and
> credibility of evidence.  " 'A jury, sitting as the trier of fact, is free to believe
> all, part or none of the testimony of any witness who appears before it.' "
> *State v. Reyes-Rosales*, 4th Dist. Adams No. 15CA1010, 2016-Ohio-3338,
> ¶ 17, quoting *State v. West*, 4th Dist. Scioto No. 12CA3507, 2014-Ohio-
> 1941, ¶ 23.  We defer to the trier of fact on these evidentiary weight and
> credibility issues because it is in the best position to gauge the witnesses'
> demeanor, gestures, and voice inflections, and to use these observations
> to weigh their credibility.

(Citations omitted.) *Anderson*, 2019-Ohio-395, at ¶ 14-15 (4th Dist.).

A.  Pleasant's Contentions

**{¶49}**  Pleasant contends testimony from the State's witnesses "simply did not

make sense" because "[i]t would defy logic" for him to expose himself to the sanitation

workers twice and hand them evidence. He also asserts that the "lack of forensic evidence

does not support the State's theory that [he] shot his grandfather, dragged the body

through the house, opened the back deck and hid the body under the deck." He claims there was no blood in the Corvette, no bloody footprints, no blood on his shoes, no gunshot residue obtained from his person, and only a small amount of his blood on the Nissan's trunk. He asserts that there is no evidence of how law enforcement collected the trash bags, processed their contents, or prevented cross-contamination. He claims a "clean plastic glove" found in the home had his and grandfather's DNA on it, but "[g]loves were in the home due to COVID and for a time when the grandmother was ill." Pleasant claims grandfather "was a large man," and it "took two or three officers to remove the body from the home." Pleasant asserts that Sergeant Forrest "attempted to place [him] at the crime scene by claiming he called twice" and spoke to Pleasant, but this testimony "was not supported by call records." He also asserts that "[g]angster rap lyrics on [his] phone does not mean he killed his grandfather." He claims the murder weapon could have come from "numerous manufacturers," and there is no evidence the gun allegedly stolen from mother was used. Pleasant claims father's testimony is "dubious" because the notion that he "would confess to a person who was never in his life strained credulity." He also claims the defense's witness testified that he needed help but "was not carjacking people," and her testimony contradicts the testimony of the office manager and her coworker.

## B. Aggravated Murder

{¶50} With respect to the aggravated murder conviction, Pleasant appears to challenge whether the State established his identity as the person who caused grandfather's death and also possibly challenges the prior calculation and design element. However, the State introduced substantial evidence that Pleasant is the person

who caused grandfather's death and that he did so with prior calculation and design. As we explained in our sufficiency analysis for the aggravated murder count, the State presented evidence from which the jury could conclude that Pleasant killed grandfather with prior calculation and design. This evidence include father's testimony that when he asked Pleasant if grandfather was aware of what was going to happen to him, Pleasant said, "Yeah, he opened his eyes. He saw me. He was reaching for a weapon." The jury was free to believe this testimony. *Anderson*, 2019-Ohio-395, at ¶ 15 (4th Dist.). The fact that father only began a relationship with Pleasant about two or three years prior to trial did not make his testimony inherently incredible.

{¶51} In addition to the evidence referenced in our sufficiency analysis, the State presented other evidence to support the aggravated murder conviction. For example, there was evidence Pleasant approached sanitation workers twice to dispose of trash bags containing evidence related to grandfather's murder. The jury was free to believe the sanitation truck driver's testimony. *Id.* The fact that the testimony indicated Pleasant made unwise decisions does not make it inherently incredible. There is also evidence Pleasant lied to Sergeant Forrest about grandfather's whereabouts twice even though the call log from Sergeant Forrest's phone contradicted his testimony that the second call between his phone and the house was an outgoing call from his phone. And contrary to what Pleasant suggests, Sergeant Forrest's testimony was not necessary to place him at the house the morning of October 26, 2022—the sanitation truck driver and Chief Johnson testified to seeing Pleasant there. There was also evidence Pleasant fled when officers tried to box him in with their cruisers, and the trial court instructed the jury that flight "may tend to indicate . . . consciousness or awareness of guilt." The State also presented

forensic evidence tying Pleasant to the killing. A glove containing Pleasant and grandfather's DNA was in one the trash bags Pleasant gave to the sanitation workers. Moreover, Pleasant's DNA was on one of the trash bags found around grandfather's body.

{¶52} For the foregoing reasons, we conclude the aggravated murder conviction was not against the manifest weight of the evidence, and we overrule the second assignment of error to the extent it asserts otherwise.

### C. Tampering with Evidence

{¶53} Pleasant was convicted of tampering with evidence in violation of R.C. 2921.12(A)(1), which states: "No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall . . . [a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation." Pleasant does not appear to challenge the State's evidence supporting the statutory elements of this offense. Instead, he appears to challenge whether the evidence established his identity as the person who committed this offense.

{¶54} The State presented substantial evidence that Pleasant is the person who tampered with evidence of grandfather's murder. The State presented evidence that trash bags were filled with items related to grandfather's murder and cleaning supplies. A glove in one of the trash bags contained major DNA profiles consistent with both grandfather and Pleasant. The sanitation truck driver identified Pleasant as the person who tried to dispose of the trash bags and identified grandfather's residence—the scene of the murder—as the location Pleasant came from during his second encounter with the

sanitation workers. Pleasant fled from law enforcement at the residence. Because the tampering with evidence conviction was not against the manifest weight of the evidence, we overrule the second assignment of error to the extent it asserts otherwise.

### D. Abuse of a Corpse

**{¶55}** Pleasant was convicted of abuse of a corpse in violation of R.C. 2927.01(B), which states: "No person, except as authorized by law, shall treat a human corpse in a way that would outrage reasonable community sensibilities." Pleasant does not appear to challenge the State's evidence supporting the statutory elements of this offense. Instead, he appears to challenge whether the evidence established his identity as the person who committed this offense.

**{¶56}** The State presented substantial evidence that Pleasant is the person who wrapped up grandfather's body in a bundle of trash bags and other items, soaked the bundle in gasoline, and hid grandfather's body under the deck. As we previously explained, the State presented substantial evidence to support Pleasant's conviction for the aggravated murder of grandfather. There is no evidence anyone but Pleasant was inside the house between the time he killed grandfather and fled from law enforcement. There is evidence Pleasant purchased gasoline the morning of or after the murder. The sanitation truck driver testified Pleasant said he needed gas and pointed toward Liberty Avenue. And at the time of Pleasant's arrest, Pleasant had one of grandfather's credit cards, which was used to buy gas at the Liberty Avenue Speedway that day. Even if grandfather's body was too heavy for Pleasant to carry, as he suggests, Pleasant could have dragged his wrapped body from the house to the area beneath the deck. Because

the abuse of a corpse conviction was not against the manifest weight of the evidence, we overrule the second assignment of error to the extent it asserts otherwise.

### E.  Failure to Comply and Theft of a Motor Vehicle

**{¶57}**  Although the second of assignment of error broadly states that Pleasant's convictions were against the manifest weight of the evidence, none of his arguments under the second assignment of error seem to relate to the convictions for failure to comply with an order or signal of a police officer or theft of a motor vehicle.  An appellant's brief must include "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies."  App.R. 16(A)(7).  Thus, we overrule the second assignment of error to the extent it asserts the convictions for failure to comply with an order or signal of a police officer and theft of a motor vehicle were against the manifest weight of the evidence.

### F.  Robbery

**{¶58}**  Pleasant was convicted of robbery in violation of R.C. 2911.02(A)(2), which states:  "No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall . . . [i]nflict, attempt to inflict, or threaten to inflict physical harm on another[.]"  Pleasant's only argument in support of the position that the robbery conviction was against the manifest weight of the evidence appears to be that the testimony of the office manager and her coworker was incredible.  Specifically, Pleasant asserts that the defense's witness described him as "needing help in Scioto County" but "not carjacking people." He asserts this testimony "contradicted" that of the office manager and her coworker.

**{¶59}** But again, "'"[a] jury, sitting as the trier of fact, is free to believe all, part or none of the testimony of any witness who appears before it"'" *Anderson*, 2019-Ohio-395, at ¶ 15 (4th Dist.), quoting *Reyes-Rosales*, 2016-Ohio-3338, at ¶ 17 (4th Dist.), quoting *West*, 2014-Ohio-1941, at ¶ 23 (4th Dist.).   And nothing about the testimony of the defense's witness made the testimony of the office manager and her coworker inherently incredible.   Pleasant's witness did not observe the encounter between Pleasant and the office manager, and the fact that Pleasant did not carjack his witness does not prove the office manager and her coworker were lying.   The testimony of the office manager and her coworker was bolstered by the testimony of their boss, the video footage from the business, and the recording of the office manager's 911 call.

**{¶60}** After weighing the evidence and all reasonable inferences, considering the credibility of the witnesses after according the requisite deference to the jury's determinations, we conclude that in resolving evidentiary conflicts, the jury did not clearly lose its way or create a manifest miscarriage of justice so that we must reverse Pleasant's conviction for robbery. Accordingly, we conclude the conviction was not against the manifest weight of the evidence.   We overrule the remainder of the second assignment of error to the extent it asserts otherwise.

## V.  MOTION TO SUPPRESS

**{¶61}** In the third assignment of error, Pleasant contends the trial court erred in denying his motion to suppress "as the evidence gathered was done without consent and the statements made were unlawfully obtained."   "Normally, appellate review of a motion to suppress presents a mixed question of law and fact."  *State v. Codeluppi*, 2014-Ohio-

1574, ¶ 7, citing *State v. Burnside*, 2003-Ohio-5372, ¶ 8. The Supreme Court of Ohio has

explained:

> When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.

(Citations omitted.) *Burnside* at ¶ 8.

### A.  Evidence from the Home

**{¶62}** Pleasant challenges the trial court's denial of his motion to suppress

evidence from grandfather's home, focusing on the initial warrantless entry into the home

and observation of the area beneath the deck.  The trial court stated that it "cannot find

that the address searched at 1217 South 9th Street, Ironton, Ohio was the address or

residence of the defendant such that he should expect to have an expectation of privacy."

The court explained that while evidence tended to show Pleasant "had been staying with

the deceased," who was "one of the owners of the home, there was no evidence that the

defendant was a resident of that address.  In fact, the defendant stated to law enforcement

that he did not know his address during his conversation with law enforcement." The court

also found that even if Pleasant had an expectation of privacy, "probable cause and an

exigent or emergency circumstances exception to the warrant requirement existed at the

time that law enforcement initially entered the premises and home . . . ."

**{¶63}** Pleasant maintains that the trial court found that he was not a resident of

the home "based on bodycam footage showing that [he] did not know his address during

his conversation with law enforcement."  He asserts that the court "made no mention of

the fact that [he] had suffered a medical episode, was complaining of a severe headache, feeling 'foggy,' and was hospitalized during the questioning." He also asserts the officers "did not speak with medical personnel beforehand to see if he was medicated or cleared for questioning." Pleasant also claims the recorded conversation between grandfather and Chief Johnson about eviction proceedings, which the State played at trial, shows he was a resident of the home. And he claims, without citation to the record, that he "took care of his grandmother and performed services around the house in exchange for staying with his grandfather." In addition, Pleasant contends the initial warrantless entry into the home and observation of the area beneath the deck was not justified under the exigent circumstances/emergency aid exception to the warrant requirement.

**{¶64}** "The Fourth Amendment to the United States Constitution and the Ohio Constitution, Article I, Section 14, prohibit unreasonable searches and seizures." *State v. Emerson*, 2012-Ohio-5047, ¶ 15. The Supreme Court of Ohio has held that these provisions provide the same protection in felony cases. *State v. Hawkins*, 2019-Ohio-4210, ¶ 18. "This constitutional guarantee is protected by the exclusionary rule, which mandates the exclusion at trial of evidence obtained from an unreasonable search and seizure." *State v. Petty*, 2019-Ohio-4241, ¶ 11 (4th Dist.).

**{¶65}** "'Fourth Amendment rights are personal in nature and may not be vicariously asserted by others.'" *State v. Burton*, 2017-Ohio-322, ¶ 10 (4th Dist.), quoting *State v. Horsley*, 2013-Ohio-901, ¶ 12 (4th Dist.), citing *Rakas v. Illinois*, 439 U.S. 128, 133-134 (1978). "'"The rule followed by courts today with regard to standing is whether the defendant had an expectation of privacy * * * that society is prepared to recognize as reasonable."'" (Omission in original.) *Id.*, quoting *State v. Dixon*, 2012-Ohio-4689, ¶ 16

(4th Dist.), quoting *State v. Williams*, 73 Ohio St.3d 153, 166 (1995). "It is well settled that "'[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his [or her] Fourth Amendment rights infringed.'"" *Id.* at ¶ 11, quoting *Horsley* at ¶ 12, quoting *Rakas* at 134.

**{¶66}** "A search violates an individual's Fourth Amendment rights only when the individual has 'a legitimate expectation of privacy' in the place searched or the item seized." *Horsley* at ¶ 13, citing *Rawlings v. Kentucky*, 448 U.S. 98, 106 (1980). "The defendant bears the burden of demonstrating that he [or she] possessed a legitimate expectation of privacy in the object of the search." *Id.*, citing *State v. Dennis*, 79 Ohio St.3d 421, 426 (1997). "Consequently, the burden is on the defendant to establish standing." *Burton* at ¶ 12, citing *Dixon* at ¶ 16. The defendant's burden to demonstrate Fourth Amendment standing "is triggered only when the government argues that the defendant lacks a protected privacy interest affected by the search or seizure." *State v. Wintermeyer*, 2019-Ohio-5156, ¶ 13.

**{¶67}** The trial court essentially found that Pleasant failed in his burden to demonstrate Fourth Amendment standing because no evidence presented at the suppression hearing showed he was a resident of the home. Pleasant claims he was a resident but does not direct our attention to any evidence from the suppression hearing to support such a finding. Instead, he tries to justify his statement to law enforcement that he did not know his address, but even if justified, his inability to recall his address is not evidence that he resided with grandfather. Pleasant also directs our attention to video footage presented at trial, but we are "'limited to the evidence presented at the

suppression hearing in our review of the trial court's decision on the motion to suppress.'" *State v. Huff*, 2020-Ohio-1064, ¶ 4, fn. 1 (12th Dist.), quoting *State v. Clarke*, 2001 WL 1255793, *1, fn. 1 (12th Dist. Oct. 22, 2001). And while Pleasant also claims he "took care of his grandmother and performed services around the house in exchange for staying with his grandfather," he provides no record citation to support this assertion. If this claim is based on evidence presented at trial, again, we cannot consider such evidence in reviewing the trial court's decision on the motion to suppress. *Id.*

**{¶68}** "An appellant bears the burden of affirmatively demonstrating error on appeal and substantiating his [or her] arguments in support thereof." *State v. Crawford*, 2024-Ohio-691, ¶ 14 (12th Dist.), citing *State v. Hager*, 2017-Ohio-5670, ¶ 14 (12th Dist.). Pleasant failed to show the trial court erred when it found that he failed in his burden to demonstrate Fourth Amendment standing. Therefore, we conclude the trial court did not err when it denied Pleasant's motion to suppress evidence obtained from the home and overrule the third assignment of error to the extent it asserts otherwise. This decision renders moot Pleasant's challenge to the trial court's alternative finding regarding the applicability of an exception to the warrant requirement.

### B. Pleasant's Statements

**{¶69}** Pleasant also challenges the trial court's denial of his motion to suppress statements he made after Trooper Lewis took him into custody. The trial court found that after Trooper Lewis *Mirandized* Pleasant, he "was alone in the vehicle and made an unsolicited statement that was captured on the camera in the interior of the cruiser." The court found that when Trooper Lewis later asked Pleasant for his name and social security number, he said he could not breathe, but the video footage showed "he did in fact

continue to breathe and make periodic statements for more than twenty (20) minutes before medical assistance arrived on the scene." Based on the testimony of law enforcement and video footage of the two interviews, the court found by a preponderance of the evidence that Pleasant's statements were voluntary.

**{¶70}** Pleasant maintains that after Trooper Lewis took him into custody, "he was placed in handcuffs and questioned at the scene despite his repeated complaints of medical distress." Pleasant asserts that body camera footage "corroborates [him] being in pain and confused." He claims "his mental and physical condition prevented a knowing, voluntary and intelligent waiver of his rights as set forth in *Miranda v. Arizona*, 384 U.S. 436 (1966)." He asserts that statements made before and after he was advised of his rights were involuntary and should have been suppressed.

**{¶71}** In *Miranda*, "the United States Supreme Court established procedural safeguards for securing the privilege against self-incrimination guaranteed by the Fifth Amendment to the United States Constitution.'" *Cleveland v. Oles*, 2017-Ohio-5834, ¶ 8. The safeguards "apply only when one is subjected to custodial interrogation." *State v. Hoffner*, 2004-Ohio-3430, ¶ 26, citing *Miranda* at 478-479. Prior to questioning, the person must be warned that the person "has the right to remain silent," that anything the person says can be used against him or her in a court of law, that the person "has the right to the presence of an attorney," and that if the person "cannot afford an attorney one will be appointed for him [or her] prior to any questioning if he [or she] so desires." *Miranda* at 479. "Opportunity to exercise these rights must be afforded to [the person] throughout the interrogation" *Id.* "After such warnings have been given, and such

opportunity afforded him [or her], the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement." *Id.*

**{¶72}** "A suspect's incriminatory statements ordinarily are admissible . . . if law enforcement officers gave the suspect the *Miranda* warnings and if the suspect implicitly or explicitly waived the Fifth Amendment right against self-incrimination." *State v. Neal*, 2015-Ohio-5452, ¶ 24 (4th Dist.), citing *Berghuis v. Thompkins*, 560 U.S. 370 (2010). "If a defendant later challenges incriminating statements as involuntary, 'the state must prove a knowing, intelligent, and voluntary waiver by a preponderance of evidence.'" *Id.* quoting *State v. Wesson*, 2013-Ohio-4575, ¶ 34. Voluntariness "is determined by 'the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.'" *State v. Garrett*, 2022-Ohio-4218, ¶ 101, quoting *State v. Edwards*, 49 Ohio St.2d 31 (1976), paragraph two of the syllabus, *vacated in part on other grounds, Edwards v. Ohio*, 438 U.S. 911 (1978). "A waiver will not be deemed to be involuntary '*unless* there is evidence of police coercion, such as physical abuse, threats, or deprivation of food, medical treatment, or sleep.'" (Emphasis in original.) *Id.*, quoting *Wesson* at ¶ 35.

**{¶73}** It appears only one custodial, pre-*Miranda* statement was introduced at trial—on video footage it sounds like Pleasant says "just" right before Trooper Lewis *Mirandizes* him. This word is in no way incriminating, and *Miranda* does not apply to it because it is an unsolicited and spontaneous statement, not the product of interrogation. *State v. Neyland*, 2014-Ohio-1914, ¶ 119, citing *Rhode Island v. Innis*, 445 U.S. 291, 300

(1980). Pleasant made additional statements at the hospital before being *Mirandized* a second time, but he makes no argument that repeat *Miranda* warnings were required.

{¶74} With regard to post-*Miranda* statements, Pleasant made some statements which were not the product of interrogation. For example, he spontaneously says, "Oh fuck," and "I'm dead," after indicating he understands his *Miranda* rights. He also spontaneously asks Trooper Lewis, "Can you just kill me?"

{¶75} With regard to post-*Miranda* statements which were the product of interrogation, the totality of the circumstances shows they were voluntary. Pleasant is an adult. There is no evidence he is of below average intelligence. No evidence was presented at the suppression hearing regarding his prior criminal experience. The interrogation was not frequent, long, or intense. Law enforcement questioned Pleasant twice, for less than 30 minutes on each occasion, and Trooper Lewis's questioning was sporadic. Although there are times in the video footage when Pleasant appears to be in distress, is breathing heavily, is slumped over, and claims to not know certain information, as the trial court suggested, there is evidence indicating his condition was feigned. The trial court pointed out that even though Pleasant told Trooper Lewis he could not breathe, the video footage showed he continued to breathe and make periodic statements before medical assistance arrived. At the arrest scene, Pleasant's condition generally seems worse when interacting with Trooper Lewis than when he is alone in the cruiser with the doors closed. Moreover, at the arrest scene he claimed to not know identifying information but indicated he knew other things relevant to defending a murder charge— like that he did not kill anyone and that someone tried to kill him. There is no evidence of police coercion, such as physical abuse, physical deprivation, threats, or inducement.

**{¶76}** For the foregoing reasons, we conclude the trial court did not err when it denied the motion to suppress regarding Pleasant's statements and overrule the remainder of the third assignment of error to the extent it asserts otherwise.

## VI.  CASE CONSOLIDATION AND MOTION IN LIMINE

### A.  Case Consolidation

**{¶77}** In the fourth assignment of error, Pleasant contends in part that the trial court erred when it consolidated Case Nos. 22 CR 374 and 23 CR 165.  Pleasant asserts that under Crim.R. 14, "the trial court may grant a severance" "if it appears that the defendant would be prejudiced by joinder of the offenses," and he asserts that consolidation prejudiced him. Pleasant claims the State requested consolidation to overwhelm the jury "with a flurry of charges against" him.  He asserts joinder "is prejudicial if the jury cumulates the evidence."  He asserts that in *Gregory v. United States*, 369 F.2d 185 (D.C.Cir. 1966), the court found joinder prejudicial because there was a danger that evidence of two robberies would cumulate in the jurors' minds, and evidence of one robbery was so weak it may have been insufficient to go to the jury, so its primary usefulness was to support the government's case as to the other robbery.  He asserts that "[l]ikewise, the usefulness of the State's move for joinder here was to bolster its aggravated murder case . . . ."

**{¶78}** "'Issues of joinder and severance are generally reviewed under an abuse of discretion standard.'"  *State v. Gideon*, 2021-Ohio-1863, ¶ 5 (3d Dist.), quoting *State v. Plott*, 2017-Ohio-38, ¶ 52 (3d Dist.).  An abuse of discretion is "an unreasonable, arbitrary, or unconscionable use of discretion, or . . . a view or action that no conscientious judge could honestly have taken."  *State v. Brady*, 2008-Ohio-4493, ¶ 23.  Although one of the

trial court's entries stated that Pleasant did not object to consolidation, the record reflects that Pleasant opposed the State's initial motion to consolidate Case Nos. 22 CR 374 and 22 CR 383, and objected to the consolidation of Case Nos. 22 CR 374 and 23 CR 163 at trial. Therefore, we will not apply plain error review.

**{¶79}** "'The law favors joining multiple criminal offenses in a single trial.'" *State v. Gordon*, 2018-Ohio-259, ¶ 18, quoting *State v. Franklin*, 62 Ohio St.3d 118, 122 (1991). Crim.R. 13 provides that a court may order two or more indictments be tried together, if the offenses "could have been joined in a single indictment." Crim.R. 8(A) states:

> Two or more offenses may be charged in the same indictment . . . if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct.

**{¶80}** Pleasant does not assert that the offenses in Case Nos. 22 CR 374 and 23 CR 165 could not have been joined in a single indictment; instead, he asserts joinder prejudiced him. Crim.R. 14 provides that "[i]f it appears that a defendant . . . is prejudiced by . . . joinder for trial together of indictments, . . . the court shall order an election or separate trial of counts . . . or provide such other relief as justice requires." The Supreme Court of Ohio has stated:

> A defendant claiming error in the trial court's refusal to allow separate trials of multiple charges under Crim.R. 14 has the burden of affirmatively showing that his rights were prejudiced; he must furnish the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial, and he must demonstrate that the court abused its discretion in refusing to separate the charges for trial.

*State v. Torres*, 66 Ohio St.2d 340 (1981), syllabus.

**{¶81}** Pleasant has not affirmatively demonstrated that his rights were prejudiced. "[T]he jury is believed capable of segregating the proof on multiple charges when the

evidence as to each of the charges is uncomplicated." *Id.* at 343, citing *State v. Roberts*, 62 Ohio St.2d 170, 175 (1980). "Joinder may be prejudicial when the offenses are unrelated and the evidence as to each is very weak, but it is otherwise when the evidence is direct and uncomplicated and can reasonably be separated as to each offense." (Citations omitted.) *Id.* at 343-344. The evidence in this case was direct and uncomplicated, could reasonably be separated as to each offense, and was amply sufficient to sustain each verdict, whether or not the indictments were tried together. We overrule the fourth assignment of error to the extent it challenges the consolidation of Case Nos. 22 CR 374 and 23 CR 165.

## B. Motion in Limine

**{¶82}** In the remainder of the fourth assignment of error, Pleasant contends the trial court erred when it granted the State's motion in limine regarding anticipated hearsay testimony from Captain Gue. Pleasant asserts that the court abused its discretion because the motion was untimely under Crim.R. 12(D), relying on *State v. Bartram*, 2006-Ohio-3505 (5th Dist.), to support his position. He claims "[t]he State should have known Gue was a defense witness but was allowed to sandbag counsel right before he presented his case." Pleasant asserts that he was prejudiced because he "was forced to abandon a critical part of his defense – there were clear discrepancies between the sanitation workers in the identification of [him]."

**{¶83}** "[D]ecisions granting or denying a motion in limine are reviewed under an abuse-of-discretion standard of review." *Estate of Johnson v. Randall Smith, Inc.*, 2013-Ohio-1507, ¶ 22. However, Pleasant did not object to the State's motion in limine on timeliness grounds and has therefore forfeited all but plain error review. Crim.R. 52(B)

states: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "It is the defendant's burden to 'establish that an error occurred, it was obvious, and it affected his or her substantial rights.'" *State v. Shields*, 2023-Ohio-2331, ¶ 72 (4th Dist.), quoting *State v. Fannon*, 2018-Ohio-5242, ¶ 21 (4th Dist.). To affect substantial rights, "the trial court's error must have affected the outcome of the trial." *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶84} Crim.R. 12(D) states: "All pretrial motions except as provided in Crim.R. 7(E) and 16(M) shall be made within thirty-five days after arraignment or seven days before trial, whichever is earlier. The court in the interest of justice may extend the time for making pretrial motions." Crim.R. 12(C) states: "Prior to trial, any party may raise by motion any defense, objection, evidentiary issue, or request that is capable of determination without the trial of the general issue." Crim.R. 12(C) then sets forth matters which "must be raised before trial": (1) defenses and objections based on defects in the institution of the prosecution; (2) defenses and objections based on defects in the indictment, information, or complaint with certain exceptions; (3) motions to suppress evidence on the ground that it was illegally obtained; (4) Crim.R. 16 discovery requests; (5) Crim.R. 14 requests for severance of charges or defendants; (6) requests for the appointment of expert witnesses where the defendant cannot afford the cost; and (7) requests for the appointment of investigators where the defendant cannot afford the cost.

**{¶85}** Pleasant does not argue that the trial court committed plain error, and even if he had, he has not shown error occurred, let alone plain error. "A motion in limine is a motion made before *or during the trial* to prevent matters which are irrelevant, inadmissible, or prejudicial from being placed into evidence." (Emphasis added.) *Woodgeard v. Hines*, 2023-Ohio-2362, ¶ 15 (4th Dist.), citing *State v. Grubb*, 28 Ohio St.3d 199, 200 (1986). Although Crim.R. 12(D) sets a deadline for pretrial motions, Crim.R. 12(C) does not require a party to make a motion to prevent the introduction of inadmissible hearsay before trial. Moreover, "the trial court has the authority to hear arguments concerning the admissibility of evidence at any time, including during trial." *State v. Williamson*, 2004-Ohio-3545, ¶ 3 (3d Dist.). So even if the motion in limine was untimely under Crim.R. 12(D), the trial court still could have excluded testimony by Captain Gue regarding inadmissible hearsay statements of the sanitation workers in response to a contemporaneous objection by the State.

**{¶86}** *Bartram* is inapposite. There, the appellate court affirmed the denial of a pretrial motion in limine as untimely under Crim.R. 12(D). *Bartram*, 2006-Ohio-3505, ¶ 18 (5th Dist.). In this case, the State did not file a pretrial motion, and as explained above, it did not have to do so under Crim.R. 12(C).

**{¶87}** We overrule the remainder of the fourth assignment of error to the extent it asserts the trial court erred by granting the State's motion in limine.

## VII. INEFFECTIVE ASSISTANCE OF COUNSEL

**{¶88}** In the fifth assignment of error, Pleasant contends he received ineffective assistance of counsel. "Upon direct appeal, appellate courts generally review claims of ineffective assistance of counsel on a de novo basis, simply because the issue originates

at the appellate level; no trial court has ruled on the issue." *State v. Gondor*, 2006-Ohio-6679, ¶ 53. "Appellate courts review the trial record and are left to judge from the bare record whether the assistance was effective." *Id.*

**{¶89}** "[T]o prevail on an ineffective-assistance-of-counsel claim, a defendant must prove that counsel's performance was deficient and that the defendant was prejudiced by counsel's deficient performance." *State v. Davis*, 2020-Ohio-309, ¶ 10, citing *State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989), and *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The defendant "has the burden of proof because in Ohio, a properly licensed attorney is presumed competent." *Gondor* at ¶ 62. "[T]o show deficient performance, the defendant must prove that counsel's performance fell below an objective level of reasonable representation. To show prejudice, the defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *State v. Conway*, 2006-Ohio-2815, ¶ 95, citing *Strickland* at 687, and *Bradley* at 143. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694. Failure to satisfy either part of the ineffective-assistance-of-counsel test is fatal to the claim. *See id.* at 697.

### A. Failure to File Motion in Limine

**{¶90}** Pleasant contends trial counsel was ineffective for not filing a motion in limine "objecting to the introduction of inadmissible and prejudicial evidence." Pleasant maintains that the State did not provide proper notice of its intent to use the testimony of mother and her boyfriend to establish prior bad acts under Evid.R. 404(B). Pleasant asserts that mother speculated that he broke into her home and stole a gun in retaliation for getting kicked out of the house and that her boyfriend "speculated that the ammunition

found at the crime scene was from the stolen gun." He claims trial counsel "failed to meet an essential duty to" him by not objecting "to such prejudicial testimony." Pleasant asserts that "[w]ithout some link between [his] alleged gun theft and the present criminal act, the speculative testimony could have been used only for one purpose in this case and that was to prove that [he] acted in conformity therewith (i.e., he stole a gun in the past and, therefore, he must have used that gun to murder his grandfather)."

{¶91} Even if counsel's performance was deficient, Pleasant has not shown that there is a reasonable probability that but for counsel's alleged error, the result of the proceeding would have been different. Pleasant suggests that without evidence related to the gun theft, there is a reasonable probability that he would not have been convicted of aggravated murder. However, even without such evidence, there was overwhelming evidence of guilt on that charge, including evidence that Pleasant told a family friend he was going to kill grandfather the day of or day before the shooting, confessed to father, tried to clean the crime scene and dispose of evidence, and fled from law enforcement at the crime scene. *See generally State v. Delawder*, 2015-Ohio-1857, ¶ 3 (4th Dist.) (given overwhelming evidence of guilt, defendant had not established a reasonable probability that, but for counsel's allegedly deficient performance, result of jury trial would have been different). Accordingly, we overrule the fifth assignment of error to the extent it asserts trial counsel was ineffective for not filing a motion in limine.

### B. Failure to Call Correct Witnesses

{¶92} Pleasant also contends trial counsel was ineffective for failing "to call the correct witnesses on misidentification." Pleasant claims counsel should have called the other sanitation workers as witnesses "so they could testify as to their own actions, i.e.,

their uncertainty and inability to identify Pleasant." He maintains that counsel's failure to do so "forced [him] to abandon a critical part of his defense – the clear discrepancies in the identification of [him]." Pleasant asserts that the testimony of the other sanitation workers "would have injected reasonable doubt as to the identification of [him]."

**{¶93}** Even if counsel's performance was deficient, Pleasant has not shown that there is a reasonable probability that but for counsel's alleged error, the result of the proceeding would have been different. Pleasant's assertion that the testimony of the other sanitation workers would have injected reasonable doubt into the driver's identification is not well-taken. The sanitation worker who did not make an identification in the photo lineup told Captain Gue the other workers got a better look than he did. The sanitation worker who identified someone other than Pleasant was less confident in his identification than the driver was, and there is no other evidence the person that worker identified was in fact the perpetrator. The other evidence supported the driver's identification of Pleasant. Because Pleasant has not shown counsel's allegedly deficient performance prejudiced him, we overrule the fifth assignment of error to the extent it asserts trial counsel was ineffective for failing to call the correct witnesses on misidentification.

## VIII. PROSECUTORIAL MISCONDUCT

**{¶94}** In the sixth assignment of error, Pleasant contends prosecutorial misconduct denied him constitutional rights. "'The test for prosecutorial misconduct is whether the conduct was improper and, if so, whether the rights of the accused were materially prejudiced.'" *State v. Brunner*, 2019-Ohio-3410, ¶ 9 (4th Dist.), quoting *State v. Leonard*, 2009-Ohio-6191, ¶ 36 (4th Dist.), citing *State v. Smith*, 2002-Ohio-6659, ¶ 45

("*Smith*").  "'To establish prejudice, a defendant must show that a reasonable probability exists that, but for the prosecutor's improper remarks, the result of the proceeding would have been different.'"  *State v. Martin*, 2024-Ohio-2334, ¶ 80 (4th Dist.), quoting *State v. Topping,* 2012-Ohio-5617, ¶ 83 (4th Dist.).  "'"The 'conduct of a prosecuting attorney during trial cannot be grounds for error unless the conduct deprives the defendant of a fair trial.'"'"  *Id.* at ¶ 81, quoting *State v. Purdin,* 2013-Ohio-22, ¶ 31 (4th Dist.), quoting *State v. Givens*, 2008-Ohio-1202, ¶ 28 (4th Dist.), quoting *State v. Gest,* 108 Ohio App.3d 248, 257 (8th Dist.1995).  "The 'touchstone of analysis * * * is the fairness of the trial, not the culpability of the prosecutor. * * * The Constitution does not guarantee an "error free, perfect trial."'"  (Omissions in original.)  *Purdin* at ¶ 31, quoting *Leonard* at ¶ 36, quoting *Gest* at 257.

{¶95}  Pleasant did not object to the purported acts of prosecutorial misconduct at trial and thus forfeited all but plain error review.  *Smith* at ¶ 45.  Pleasant does not argue plain error.  Even if he had, as we explain below, Pleasant has not established that the prosecutor engaged in improper conduct, let alone that plain error occurred.

{¶96}  First, Pleasant contends "[t]he prosecutor's line of questioning and commentary regarding [his] medical episode after his arrest amounted to prosecutorial misconduct." He asserts that "[i]n opening statements, closing statements and through the testimony of Trooper Lewis, [he] was accused of faking medical distress, and thus a liar whose defense should not be believed."  Pleasant claims "[m]edical professionals did not agree with the trooper as [he] was hospitalized."  And he asserts "[i]ntroducing Trooper Lewis' testimony and unprofessional 'assessment' was inherently prejudicial and inappropriate for the jurors to have considered when determining [his] guilt."

**{¶97}** Pleasant's contentions are not well-taken. Pleasant does not provide record citations to any comments the prosecutor made about his medical condition during opening statements or closing arguments. *See* App.R. 16(A)(1)(7) (an appellant's brief shall include "citations to the . . . parts of the record on which appellant relies"). The only record citation he provides is to the portion of Trooper Lewis's testimony in which the prosecutor solicits testimony about whether Pleasant had problems with his legs or passed out when Trooper Lewis transported him to the cruiser and whether Trooper Lewis felt Pleasant was in any medical danger. "'[I]t is not prosecutorial misconduct to introduce evidence that the trial court has determined to be admissible.'" *State v. Knuff*, 2024-Ohio-902, ¶ 236, quoting *State v. Perez*, 2009-Ohio-6179, ¶ 187.

**{¶98}** Next, Pleasant contends the prosecutor "referenced irrelevant, unduly prejudicial evidence throughout the case." He claims "[a] bloody thumbprint on cleaning products allegedly belonged to [him], yet it was never tested by BCI to prove it belonged to him." He directs our attention to a comment the prosecutor made during opening statements about there being a container with a bloody thumbprint in the first trash bag given to the sanitation workers, and a comment the prosecutor made during closing arguments about the driver testifying that there appeared to be a bloody thumbprint in the first bag. Contrary to what Pleasant suggests, the prosecutor did not say the thumbprint was his despite a lack of testing. Pleasant also directs our attention to a portion of the driver's direct testimony in which he testifies about seeing the bloody thumbprint. But again, introducing evidence the trial court has determined to be admissible is "'not prosecutorial misconduct.'" *Knuff* at ¶ 236, quoting *Perez* at ¶ 187.

**{¶99}** Next, Pleasant contends that "[t]o prove prior calculation and design, the State asserted that [he] purchased gas the morning of October 26, 2022." He suggests this assertion is unfounded because "when it came time to document that [he] purchased gas he did not need (allegedly to dispose of his grandfather's body), the State offered a Speedway worker who did not witness anything and a receipt," which "allegedly belonged to [him]." The receipt from the Liberty Avenue Speedway indicates that on October 26, 2022, at 6:18 a.m., a Mastercard ending in 2327 which expired on 02/23 was used to buy 19.1900 gallons of gas for $76.74. Contrary to what Pleasant suggests, the State presented evidence that he made this purchase. The sanitation truck driver testified that Pleasant told him that he needed gas and pointed toward Liberty Avenue. The State also presented evidence that at the time of his arrest, Pleasant was in possession of grandfather's Mastercard ending in 2327, which expired on 02/23, and the card was used that day for the $76.74 purchase.

**{¶100}** Next, Pleasant contends the "mischaracterization of evidence continued with the introduction of a 9mm round that was not part of the case." He claims the prosecutor "used a bullet from [mother's boyfriend's] extra clip . . . to state that it was the same ammunition stolen and used to kill" grandfather, and thus, the prosecutor used mother's boyfriend "to layer speculation." The only record citations Pleasant provides in support of this argument are to (1) the portion of mother's boyfriend's testimony in which the prosecutor solicits testimony about the extra round of ammunition, and (2) the exhibit number for the round. Again, introducing evidence the trial court has determined to be admissible is "'not prosecutorial misconduct.'" *Knuff*, 2024-Ohio-902, at ¶ 236, quoting *Perez*, 2009-Ohio-6179, at ¶ 187.

{¶101}        Next, Pleasant asserts that the rap lyrics "did not relate to the alleged crimes and should not have been considered when the jury was determining culpability." He cites a federal case which he claims found no justification for the admission of rap lyrics because "they had no probative value and were prejudicial due to their offensive nature." Again, introducing evidence the trial court has determined to be admissible is "'not prosecutorial misconduct.'" *Knuff* at ¶ 236, quoting *Perez* at ¶ 187.

{¶102}        Finally, Pleasant asserts that "[t]he cumulative weight of the prosecutor's improper comments prejudicially affected [his] substantive right to a fair trial." But Pleasant has not shown the prosecutor made any improper comments.

{¶103}        Because Pleasant has not demonstrated prosecutorial misconduct occurred, we overrule the sixth assignment of error.

## IX.  CONCLUSION

{¶104}        Having overruled the assignments of error, we affirm the trial court's judgments.

JUDGMENTS AFFIRMED.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENTS ARE AFFIRMED and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the LAWRENCE COUNTY COURT OF COMMON PLEAS to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. & Wilkin, J.: Concur in Judgment and Opinion.

For the Court

BY: _____
Michael D. Hess, Judge

### **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**